Erick G. Kaardal (WI0031)
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota  55402
Telephone: (612) 341-1074
Facsimile:  (612) 341-1076
Email: kaardal@mklaw.com
*Attorneys for Petitioners*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MDEWAKANTON BAND OF SIOUX IN MINNESOTA, TERRI ROBERTSON-TORGERSON AND ROSS TORGERSON, | Case No. 19-402 |
| Petitioners, | |
| v. | |
| DAVID BERNHARDT, in his official capacity as acting Secretary of the Interior, or his successor, U.S. Department of the Interior 1849 C Street NW Washington, D.C. 20240; and | |
| TARA KATUK MAC LEAN SWEENY in her official capacity Assistant Secretary-Indian Affairs, or her successor, U.S. Department of the Interior 1849 C Street NW Washington, D.C. 20240. | |
| Respondents. | |

## PETITION FOR A WRIT OF MANDAMUS

The Petitioners Mdewakanton Band of Sioux in Minnesota, Terri
Robertson-Torgerson, and Ross Torgerson for their petition for mandamus
allege as follows:

## INTRODUCTION

The Mdewakanton Band of Sioux in Minnesota ("the Mdewakanton
Band"), an American Indian tribe, that preceded the federal government, is
identified in treaties and statutes, and has never been terminated by any act
of Congress.  Yet, the Mdewakanton Band is not listed as a federally-
recognized Indian tribe by the U.S. Department of the Interior.  The
Mdewakanton Band seeks a writ of mandamus to require the U.S.
Department of the Interior to list the Mdewakanton Band as a federally-
recognized tribe.

The Mdewakanton Band has never lost or relinquished its status as a
historic, pre-federal government Indian Tribal entity subject of treaties and
statutes pertaining to it.  Congress has never terminated the Mdewakanton
Band as an Indian tribe. Its members did not sever their tribal relations.  The
Mdewakanton Band continues to have treaty and statutory legal
relationships with the federal government.  In short, despite the failure of the
federal government to list the Mdewakanton Band, the Mdewakanton Band
is a federally-recognized Indian tribe.

Interior's failure to annually list the Mdewakanton Band is a continuing legal Interior error.  Congressional statutes lack a statutory procedure to list federally recognized tribes which have been omitted.  Likewise, Interior rules lack an administrative procedure to list federally-recognized tribes which have been omitted. Any current administrative process is inapplicable under 25 C.F.R. Part 83, because 25 C.F.R. § 83.3 applies "only to indigenous entities that are *not* federally recognized Indian tribes." (Emphasis added).  Ministerially, the Secretary or the Assistant Secretary for Indian Affairs or both are statutorily obligated to include the Petitioner Mdewakanton Band on the list because the Mdewakanton Band is a federally-recognized Indian tribe.

The Mdewakanton Band currently has three identified members who are direct lineal descendants of the Band who were among those Mdewakanton Indians that did not participate in the infamous Minnesota Indian uprising of 1862.  The identified three members include Terri Robertson-Torgerson, Ross Torgerson, and his child.  They are direct descendants of Mdewakanton Sioux Chief Wabasha I of the Mdewakanton Band.  They, nor their descendants, severed their Mdewakanton tribal relations as other Mdewakanton tribal members have.

This Court can direct Interior to list the Mdewakanton Band as a federally-recognized Indian tribe by issuance of the writ of mandamus under the All Writs Act, 28 U.S.C.§ 1651(a).

The Department's mistaken omission must be corrected.

## JURISDICTION

1.     Jurisdiction is founded upon 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1362, 28 U.S. C. §1651(a); 28 U.S.C. § 2201, and 5 U.S.C. §§ 701-708.

2.     The All Writs Act, 28 U.S.C. § 1651(a) confers the power of mandamus on federal courts for a lawful exercise of the prescribed jurisdiction.

3.     Under the Administrative Procedures Act claim, 5 U.S.C. § 702, a person may sue for a legal wrong against the Interior Secretary or Assistant Secretary for Indian Affairs or both for acting or failing to act:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

4.     The Interior Secretary or Assistant Secretary for Indian Affairs or both failed to identify and list the Mdewakanton Band as a federally-recognized Indian tribe.  The Mdewakanton Band never was terminated as a tribe and as such the Secretary or Assistant Secretary for Indian Affairs or both have violated the Mdewakanton Band's legal rights and entitlements under federal statutory law.

5.     Each year, Interior publishes the List Act. Section 104 of the Act of November 2, 1994 (Pub. L. 103-454; 108 Stat. 4791, 4792). Each year, the Mdewakanton Band is omitted from the list of federally-recognized Indian tribes.  Therefore, the filing of the instant petition for a writ of mandamus is timely as the Secretary or Assistant Secretary for Indian Affairs or both have failed to list the Mdewakanton Band. Hence, their actions or failed actions are continuing.

6.     Petitioners, in 2014, had previously submitted to Interior an administrative Petition seeking reaffirmation of the Mdewakanton Band of Sioux in Minnesota as a federally recognized and acknowledged Indian tribe under previous Department regulations under 25 C.F.R. Part 83 (2014). **Exhibit 1.**

7.     Although the 2014 Petition was not necessary, it was filed in an abundance of caution regarding any issues related to the exhaustion of

administrative remedies. But, Interior nevertheless failed or refused to act upon it.

8.      Instead, on the eve of the final decision-making process on the Petition, Interior revised the governing regulations applicable to petitions regarding reaffirmation. The revisions abandoned the ability for any tribe to seek reaffirmation under Part 83.

9.      Because the current regulations under Part 83 do not apply to federally-recognized Indian tribes, which the Mdewakanton Band is, as explained in this petition, the Mdewakanton Band is precluded from pursuing any administrative relief under Part 83.

10.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e) because at least one Respondent resides within the District of Columbia or a substantial part of the events or omissions giving rise to the claims herein occurred in the District of Columbia.

## PARTIES

### The Petitioners

11.     Mdewakanton Band of Sioux in Minnesota ("Mdewakanton Band") is a recognized and acknowledged Indian tribe with the following currently-identified members: Terri Robertson-Torgerson, Ross Torgerson, and his child.  They are half-blood Indians of the Mdewakanton Band.

12.     Terri Robertson-Torgerson and Ross Torgerson are lineal descendants of Nancy Santee and Thomas A. Robertson. Nancy was a member of the Mdewakanton Band, as was her husband Thomas. Thomas was a "mixed-blood" Mdewakanton Band member.

13.     Terri Robertson-Torgerson's father, Melvin Robertson, Sr., a mixed-blood member of the Mdewakanton Band, born in 1914 on an Indian reservation where he lived his entire life.  Melvin Robertson, Sr., lived on an Indian reservation in 1934.  He died in 1986. He never severed his tribal relations with the Mdewakanton Band.

14.     Terri Robertson-Torgerson was born in 1964.  Terri Robertson-Torgerson is a mixed-blood Indian of the Mdewakanton Band (half-blood). She has lived on an Indian reservation her entire life.

15.     Ross Torgerson was born in 1985.  Ross Torgerson is a mixed-blood Indian of the Mdewakanton Band (half-blood).  He has lived on an Indian reservation his entire life.

16.     The child of Ross Torgerson was born in 2017.  The child is a mixed-blood Indian of the Mdewakanton Band.  He has lived on an Indian reservation his entire life.

17.     Thomas A. Robertson, also known as Zitkanahowaste (Good Sounding Bird or Bird With A Beautiful Voice), was born to Mdewakanton Band member Jane Anderson Robertson and her husband, Scotland native

7

Andrew Robertson, on October 24, 1839 on Grey Cloud Island, Minnesota. They had a son named Thomas A. Robertson.

18.     Jane Robertson never severed her tribal relations with the Mdewakanton Band.  Notably, her name appears on a Mixed-Blood List of Mdewakanton tribal members.  Jane's son Thomas also appears on that same list.

19.     Thomas A. Robertson was identified by the Department as one of the thirty-six Dakota Sioux, including Mdewakanton Band members, who received compensation as a "friendly" Sioux under the Act of February 9, 1865.  Thomas A. Robertson was also both a holder of and eligible for scrip to land of the Lake Pepin Reservation under the Act of July 17, 1854, 10 Stat. 304, and entitled to or eligible for land as an identified Mdewakanton individual "who exerted himself in rescuing the white from the late massacre of said Indians" under Section 9 of the Act of February 16, 1863.

20.     As lineal descendants of Thomas A. Robertson, Petitioners Terri Robertson-Torgerson and Ross Torgerson are Mdewakanton Band members who are entitled to or eligible for Mdewakanton Band property interests, including reservations and their boundaries, under unrepealed federal statutes with current Federal responsibilities and obligations.

**The Respondents**

21.     Respondent David Bernhardt is the acting Secretary of the U.S.

Department of the Interior.  The Secretary of the Interior gives direction to

the Assistant Secretary of Indian Affairs.  *See also* 25 U.S.C. § 9 (The

President may prescribe such regulations as he may think fit for carrying

into effect the various provisions of any act relating to Indian affairs, and for

the settlement of the accounts of Indian affairs),

22.     Respondent Tara Katuk Mac Lean Sweeney is the Assistant

Secretary—Indian Affairs at the DOI headquarters in Washington, DC.

Under 25 U.S.C. § 2, the Assistant Secretary of Indian Affairs, under the

direction of the Secretary of the Interior, and agreeable to such regulations as

the President may prescribe, has management of all Indian affairs and of all

matters arising out of Indian relations. *See also* 25 U.S.C. § 9. (The President

may prescribe such regulations as he may think fit for carrying into effect the

various provisions of any act relating to Indian affairs, and for the settlement

of the accounts of Indian affairs).

23.     All Respondents or their respective successors are sued only in

their official capacity.

## STATEMENT OF FACTS

**A.    The Petitioners Terri Robertson-Torgerson and Ross Torgerson are descendants of Sioux Chief Wabasha I of the Mdewakanton Band of Sioux who have never severed their tribal relations with the Band.**

24.    The Petitioners Terri Robertson-Torgerson and Ross Torgerson are half-blood Indians and lineal descendants of Mdewakanton Sioux Chief Wabasha I.  Chief Wabasha I had a daughter Mar-pi-ya-ro-to-win, also known as Grey Cloud Woman I.  She married James Aird (a fur-trader from Scotland).  They had one daughter, Margaret (Mar-pi-ya-ro-to-win) also known as Grey Cloud Woman II.  Margaret would marry a British army officer, Captain James Anderson, and had a daughter named Jane Anderson.

25.    Margaret (Grey Cloud Woman II) would later separate from James Anderson and would marry Hazen Mooers (becoming Margaret Aird-Mooers.)  Margaret's daughter Jane Anderson would marry Andrew Robertson.

26.    As a historic note, sometime between 1837 and 1847, Andrew Robertson named Grey Cloud Island, located in Washington County, Minnesota, within the Mississippi River, in honor of his mother-in-law, Margaret Aird-Moors (Grey Cloud Woman II).  Grey Cloud Island was also the birthplace of Thomas A. Robertson.

27.    Jane Robertson and Thomas A. Robertson would later appear on the Mixed Blood List of Mdewakanton.

28.     At no time did Jane Robertson sever her tribal relations with the Mdewakanton Band.

29.     At no time did Thomas A. Robertson sever his tribal relations with the Mdewakanton Band.

30.     Jane Robertson's son Thomas A. Robertson would marry Nancy Santee.  Nancy was a member of the Mdewakanton Band, as was her husband Thomas recognized as a member of the Band.  Jane and Thomas were "mixed-blood" Mdewakanton Band members.

31.     Petitioners Terri Robertson-Torgerson and Ross Torgerson, are the great-granddaughter and the great-great-grandson of Thomas A. Robertson.  Thomas A. Robertson, at great risk of his own life, rescued white settlers from death during the Minnesota Sioux Uprising of 1862.  Notably, Mdewakanton Thomas A. Robertson participated as an interpreter and was a signatory to the Sioux Treaty of 1858 on behalf of the Mdewakanton Band. (Treaty with the Sioux (June 19, 1858), 12 Stat. 1031). Thomas A. Robertson was part of and traveled with the Mdewakanton Band treaty delegation to Washington, D.C. **Exhibit 2.**

32.     Jane Robertson and Thomas A. Robertson, as mixed-blood members of the Mdewakanton Band, were entitled to and did receive land in 1858 within the boundaries of the Lake Pepin Reservation in Minnesota created through the Treaty of Prairie du Chien of July 15, 1830.

33.     By the Congressional Act of July 17, 1854, 10 Stat. 304, which specifically referenced the Lake Pepin Reservation, Congress had identified, acknowledged, and recognized the mixed-bloods of the Mdewakanton Band— recognizing  the Band, their entitlement to land, and future interest regarding those reservation lands.  The statutory boundary of the Lake Pepin Reservation still exists and is unrepealed.

34.     Jane Robertson, in accordance with the Act of 1854, would eventually receive scrip of up to 480 acres.

35.     With the scrip, Jane Roberson sold *some* of her acreage, but *not all* of her acreage found within the Lake Pepin Reservation.

36.     Not all lands in the Lake Pepin Reservation were publicly sold.

**B.    Terri Robertson-Torgerson and Ross Torgerson are lineal descendants and half-blood Mdewakanton Band Indians who never severed their tribal relations.**

37.     Terri Robertson-Torgerson and Ross Torgerson are members of the Mdewakanton Band.

38.     Terri Robertson-Torgerson's mother was Doris King LaFontaine, daughter of Louise Dugan King and Mathew King, Sr. Doris was ¾ or 75% Indian blood.

39.     Melvin Robertson, Sr. is Terri Robertson-Torgerson's father. Melvin's father was Charles Robertson and his mother was Jane Adams. Melvin is a lineal descendant of Mdewakanton Sioux Chief Wabasha I.

Melvin Robertson, Sr., a half-blood member of the Mdewakanton Band, was born in 1914 on an Indian reservation where he lived his entire life.

40.     Melvin Robertson, Sr., lived on an Indian reservation in 1934. He died in 1986. He never severed his tribal relations with the Mdewakanton Band. Melvin was 25/32 or 78% Indian blood.

41.     Terri Robertson-Torgerson was born in 1964.  Terri Robertson-Torgerson is a mixed-blood Indian of the Mdewakanton Band (half-blood). She has lived on an Indian reservation her entire life.  She is 49/64 or 77% Indian blood.

42.     Ross Torgerson was born in 1985 and is the son of Terri Robertson-Torgerson.  Ross Torgerson is a mixed-blood Indian of the Mdewakanton Band (half-blood).  Ross is 135/256 or 53% Indian blood.  He has lived on an Indian reservation his entire life. He was adopted at the age of twelve by Terri Robertson-Torgerson's present husband Les Torgerson.

43.     The child of Ross Torgerson was born in 2017. The child of Ross Torgerson is a mixed-blood Indian of the Mdewakanton Band.  He has lived on an Indian reservation his entire life.

44.     At no time did Petitioner Terri Robertson-Torgerson sever her tribal relations with the Mdewakanton Band.

45.     At no time did Petitioner Ross Torgerson sever his tribal relations with the Mdewakanton Band nor has his child.

46.     Notably, the named individual Petitioners are direct Mdewakanton descendants of the individuals identified on the 1866 list. **Exhibit 3.** For the people on this list, the United States set land aside and paid compensation for their heroic efforts and participation to save white settlers during the Minnesota 1862 uprising. The people on the list did not sever their tribal relations. To receive the compensation from the February 9, 1865 Act (Act of Feb. 9, 1865, ch. 29, 13 Stat. 427) did not require the severance of tribal relations.

**C.    The Mdewakanton Band is a recognized tribe existing to this day, never having been terminated by an act of Congress.**

47.     The Mdewakanton Band is an American Indian group indigenous to the continental United States. It is not currently listed as a federally-recognized tribe by the Department.

48.     The Mdewakanton Band, members of whom have not severed their tribal relations, is the main body entity of Mdewakanton Sioux Indians.

49.     No Congressional act has terminated a federal relationship with the Mdewakanton Band.

50.     Non-tribal Indians in Minnesota, who have severed their tribal relations with the main body of the Mdewakanton Band of Sioux in Minnesota include Prairie Island Indian Community members (organized under the Indian Reorganization Act (ch. 576, 48 Stat. 984)); the Lower Sioux

Indian Community members (organized under the Indian Reorganization
Act-1936(ch. 576, 48 Stat. 984)); and the Shakopee Mdewakanton Sioux
Community members (organized under the Indian Reorganization Act-1969).
The non-tribal Indian groups are closed communities of non-indigenous
Indians under the 1934 Indian Reorganization Act because the 1888, 1889,
and 1890 Appropriations Act contained the "severance of tribal relations"
provisions and under 25 U.S.C. § 479, they do not necessarily qualify under
that definition of "Indian."

    51.    Section 479 states as to an "Indian:"

> The term "Indian" as used in this Act shall include all
> persons of Indian descent who are members of any
> recognized Indian tribe now under Federal
> jurisdiction, and all persons who are descendants of
> such members who were, on June 1, 1934, residing
> within the present boundaries of any Indian
> reservation, and shall further include all other
> persons of one-half or more Indian blood.

    52.    The lands upon which the Communities were established under
the Indian Reorganization Act were appropriated by the 1888, 1889, and
1890 Appropriations Acts.   Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29
($20,000); Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93 ($12,000); Act of
Aug. 19, 1890, ch. 807, 26 Stat. 336, 349 ($8,000). Although each of the
Appropriations Acts used slightly different language, the operative provisions
were largely similar. The 1890 Act, for example, provided

> For the support of the full and mixed blood
> Indians in Minnesota heretofore belonging to
> the Medewakanton (sic) band of Sioux Indians,
> who ... have severed their tribal relations....

53.     These Congressional Acts required the severance of tribal
relations to obtain access to and reside upon those lands.  The expressed
Congressional restriction resulted in the basis of the Communities' initial
organization under the IRA as non-tribal Indians residing on reservation
land.  The Communities represent non-tribal members who severed tribal
relations as with respect to those lands acquired for them under the 1888,
1889, and 1890 Appropriation Acts.  As communities organized under the
IRA of non-tribal members, the members are not part of the Mdewakanton
Band.

54.     Since the Appropriation Acts of 1888, 1889, and 1890, no
Congressional Act restored these members of the Communities to tribal
membership. The federally-recognized Communities are of non-tribal
members residing on reservation lands.

55.     The groups known in Minnesota as the Prairie Island Indian
Community and its members (organized under the Indian Reorganization
Act-1936), as the Lower Sioux Indian Community and its members
(organized under the Indian Reorganization Act-1936) and as the Shakopee
Mdewakanton Sioux Community and its members are entities that consist of

non-tribal members who are subject to congressional acts that required them to terminate their relationship with the Mdewakanton Band. No Congressional Act has restored these non-tribal individuals who severed their tribal relations to tribal membership status as it relates to the Mdewakanton Band.

56.    The treaty relationships, statutory relationships and government-to-government legal relationships between the Mdewakanton Band and the United States still exists today.

57.    The United States did enter into treaties with the Mdewakanton Band prior to February 1863.

58.    Under statutory law, treaties lawfully made and ratified with any Indian nation or tribe prior to March 3, 1871 cannot be invalidated or impaired:

> [N]o obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired.

59.    The abrogation of treaties found under the Act of February 16, 1863, terminated certain moneys and land of the Mdewakanton Band, however, the remaining provisions of the treaties remained intact.

60.    Otherwise, as the legislative history of the February 16, 1863 Act reveals (Act of Feb. 16, 1863, ch. 37, 12 Stat. 652), by the statement of New

Hampshire Senator Daniel Clark, lands previously obtained from the Band

through all previous treaties would revert back to the Mdewakanton Band:

> "It does not seem to me desirable to abrogate the treaties
> which do thus secure to the United States tracts of land,
> and that we can arrive at the same end, which we desire by
> forfeiting the annuities for cause stated in the preamble,
> and letting the treaties stand."

Congressional Globe, 37th Congress, 3rd Session, January 26, 1863, 515.

61.    In other words, abrogating the treaties in their entirety with the

Mdewakanton Band would require the return of all Dakota Sioux lands in

Minnesota and surrounding territories and states to the Dakota Sioux

(including the Mdewakanton Band and three other bands) to the time before

the treaties were agreed to.

62.    In short, the Act of February 16, 1863 did not abrogate the

Dakota Sioux Indian treaties in their entirety.

63.    The so-called "Forfeiture Act," 12 Stat. 652, Sec. 1, although

using broad language, the treaties between the United States and the

Mdewakanton Band were not terminated or completely abrogated:

> [A]ll treaties heretofore made and entered into
> by the …Medawakanton (sic)…bands of Sioux
> or Dakota Indians, or any of them, with the
> United States, are hereby declared to be
> abrogated and annulled so far as said treaties
> or any of them purport to impose any future
> obligations and all lands and rights of
> occupancy within the state of Minnesota….

(Emphasis added).

64.     Under Section 9 of the so-called "Forfeiture Act," 12 Stat. 652, it identifies the exception to Section 1 regarding lands and occupancy for certain members of the Mdewakanton Band who did not participate in the 1862 uprising.

65.     Moreover, Congress did recognize the existence of the Mdewakanton Band through, for instance, the Act of 1854 (regarding the Lake Pepin Indian Reservation); the Act of February 16, 1863; the Act of March 3, 1863; the Act of February 9, 1865, the Appropriation Acts of 1888, 1889, and 1890 (requiring the severance of tribal relations, hence, acknowledgement of the existing Mdewakanton Band).

66.     Notably, the Act of July 17, 1854, Congress authorized the survey of the existing Mdewakanton Lake Pepin Reservation and with the issuance of scrip through the Act—through at least 1869—recognized and acknowledged real property interests within the reservation boundaries.  The February 1863 Act did not repeal the 1854 Congressional Act or affect the existence of the Lake Pepin Reservation for the Mdewakanton Band.  Moreover, not all lands were within the Lake Pepin Reservation were sold.

## D.    The Mdewakanton Band of Sioux in Minnesota

67.     Prior to 1851, the Mdewakanton Sioux lived along the Mississippi River, in a homeland stretching westward to Dakota Territory and northward

to above Mille Lacs Lake. To the east, their homeland covered western Wisconsin, and to the south, northern Iowa.

68. In September, 1837, the Dakota Sioux consisted of four separate bands, the Mdewakanton and Wahpekute, together comprising the "lower bands," and the Sisseton and Wahpeton, known as the "upper bands." The four bands entered into treaty negotiations, as they were, with the United States.

69. The Treaty of September 29, 1837 (7 Stat. 538, Arts. I-II) ceded to the United States all of their land east of the Mississippi River, including all of the current state of Wisconsin. The United States was to make annuity payments under Treaty's provisions, the last annuity to be paid in 1861. *See* Treaty with the Sioux (September 29, 1837), 7 Stat. 538, Arts. I-II.

70. By 1851, the four Dakota Sioux Bands, which, although related, had always been separate and distinct from each other, were essentially consolidated into two distinct tribes for purposes of treaty negotiations; the lower tribe—Mdewakanton and Wahpekute— and the upper tribe—Sisseton and Wahpeton.

71. The lower and upper Dakota Sioux tribes signed separate treaties with the United States. In 1851, the four bands of Sioux— Sisseton and Wahpeton Bands and the Mdewakanton and Wahpakoota Bands—ceded all of their lands in the Territory of Minnesota and the State of Iowa. The

Sisseton and Wahpeton Bands by the Treaty of July 23, 1851, 10 Stat. 949, ceded all of the lands owned in common by the four bands by natural boundaries.

72.     The Mdewakanton and Wahpakoota Bands by the Treaty of August 5, 1851, 10 Stat. 954, article 1, bound themselves to perpetual peace with the United States, and by article 2 ceded to the United States all of their right, title, and claim to any lands whatsoever in the Territory of Minnesota and in the State of Iowa.

73.     By article 3 of each Treaty a reservation was set apart for the Indians with an average width of ten miles on each side of the Minnesota River.  The upper bands (Sisseton and Wahpeton Bands) would live on such a reservation near the western border of the Minnesota Territory on the Minnesota River. The lower bands (Mdewakanton and Wahpakoota Bands) reside on a similar reservation further southeast on the Minnesota River.

74.     Importantly, another group of Dakota "mixed-bloods"— principally Mdewakanton Band members—would reside on the eastern border of the Minnesota Territory, in the proximity of Lake Pepin where a reservation provided for by the Act of  July 17, 1854, 10 Stat. 304, was established. The Lake Pepin reservation referenced in an 1830 treaty and established in 1854 is discussed further below.

75.     Unfortunately, instead of establishing the two reservations found within article 3, the U.S. Senate, reneged on the provision. Instead, the Senate would pay the Dakota Sioux for the reservation lands at a below market rate of ten cents per acre. The Senate in turn, authorized the President to set aside other lands as reservation lands outside the limits of the designated land; however, the President never established the promised reservation lands.

76.     Nonetheless, the lower and upper bands of Dakota Sioux continued to live on their two respective reservations on the Minnesota River. Eventually, Congress by the Act of July 31, 1854, 10 Stats. 326, confirmed some of those lands along the Minnesota River as reservations for them.

**E.      1858 Treaties promised 80 acres of land in exchange for a promise of peace with the Mdewakanton Band.**

77.     In June 19, 1858, the United States entered into yet another set of separate treaties with the lower and upper Sioux essentially cutting the reservation lands affirmed by Congress in 1854 roughly in half in exchange for compensation, including money and goods. Treaty with the Sioux (June 19, 1858), 12 Stat. 1031, Arts. I-III.

78.     Under Article 1 of the June 1858 Treaty, in exchange for the loss of their tribal lands, another promised reservation was to be established and specific acreage provided to each Sioux head of family or single person over

21years old. Interior was to set aside 80 acres for each Sioux head of

household from public lands:

> It is hereby agreed and stipulated that, as soon as practicable after the ratification of this agreement, so much of that part of the reservation or tract of land now held and possessed by the Mendawakanton (sic) and Wahpakoota bands of the Dakota or Sioux Indians, and which is described in the third article of the treaty made with them on the fifth day of August, one thousand eight hundred and fifty-one, which lies south or southwestwardly of the Minnesota River, shall constitute a reservation for said bands, and shall be surveyed, and *eighty acres thereof, as near as may be in conformity with the public surveys, be allotted in severalty to each head of a family, or single person* over the age of twenty-one years, in said band of Indians, said allotments to be so made as to include a proper proportion of timbered land, if the same be practicable, in each of said allotments....

> As the members of said bands become capable of managing their business and affairs, the President of the United States may, at his discretion, cause patents to be issued to them, for the tracts of land allotted to them, respectively, in conformity with this article; said tracts *to be exempt from levy, taxation, sale or forfeiture,* until otherwise provided for by the legislature of the State in which they are situated with the assent of Congress; *nor shall they be sold or alienated in fee, or be in any other manner disposed of* except to the United States or to members of said bands.

Treaty with the Sioux (June 19, 1858), 12 Stat. 1031) (Emphasis added.)

79.    In exchange for the promised 80 acres of land noted above, the

Sioux pledged "to preserve friendly relations with the citizens [of the United

States], and to commit no injuries or depredations on their property:"

The Mendawakanton (sic) and Wahpakoota bands of Dakota
or Sioux Indians acknowledge their dependence on the
Government of the United States, and *do hereby pledge and
bind themselves to preserve friendly relations* with the
citizens thereof, and *to commit no injuries or depredations on*
their persons or property, nor on those of the members of any
other tribe. .. They also agree to deliver to the proper officers
all persons belonging to their said bands who may become
offenders against the treaties, laws, or regulation of the
United States, or the laws of the State of Minnesota, and to
assist in discovering, pursuing, and capturing all such
offenders whenever required so to do by such officers, through
the agent or other proper officer of the Indian Department.

Treaty with the Sioux (June 19, 1858), 12 Stat. 1031 (Emphasis added).

## F.   The 1854 Act of Congress identified and memorialized the Lake Pepin Reservation as for Mdewakanton Band half-blood (mixed-blood) members.

80.     Meanwhile, by an Act of Congress, on July 17, 1854, 10 Stat. 304,

Congress reconfirmed the Lake Pepin Reservation as established for

Mdewakanton mixed-blood Indians (half-breeds or half-bloods) and their

descendants.

81.     The July 17, 1854 Act, specifically referenced the Treaty of

Prairie du Chien of July 15, 1830, that had set aside lands for the

Mdewakanton Band mixed-blood members.

82.     In so doing, Congress recognized and acknowledged the existence

of the Mdewakanton Band by the July 17, 1854 Act as it was in direct

correlation with the 1830 Treaty between the United States and the

Mdewakanton Band.

83.   The Act of July 17, 1854, as an Act of Congress, is federal recognition of the Mdewakanton Band.

84.   The mixed-blood Indians (also known as half-breeds or half-bloods) were principally members of the Mdewakanton Band.  These Indians never severed their tribal relations with the Mdewakanton Band.

85.   The Act of July 17, 1854 refers to "mixed blood" as the lineal descendants of the Dakota or Sioux bands.

86.   The July 17, 1854 Act did not require or otherwise demand the severance of tribal relations.

87.   Thomas A. Robertson was a mixed-blood Mdewakanton.  He did not severe his tribal relations with the Mdewakanton Band.

88.   The Act of July 17, 1854 provided the statutory method of assigning lands within the Lake Pepin Reservation to mixed-blood Mdewakanton Band members.  The statutory method involved the issuance of scrip.

89.   Available records reveal that 792 scrip were issued between 1857 and 1868.

90.   The Lake Pepin Reservation boundary exists to this day.

91.   Moreover, not all of the reservation land was publicly sold.

92.   The Lake Pepin Reservation exists to this day.

**G.**   **During the 1862 Minnesota uprising, friendly-heroic Sioux saved white settlers.**

> Ancestors of Petitioners Terri Robertson-Torgerson
> and Ross Torgerson did not participate in the uprising
> and were friendly-heroic Mdewakanton Sioux.

93.   For historically documented reasons, in August 1862, certain Mdewakanton, led by Mdewakanton Chiefs Little Crow and Shakopee, revolted against the United States and the white settlers.  Hundreds of white settlers and an untold number of Sioux Indians died in the conflict.

94.   During the course of the uprising, a number of Dakota Sioux risked their own lives, and assured ostracism by their own people, by rescuing white settlers who had been captured and been held hostage, by the rebellious Sioux, saving the lives of almost 300 settlers, mostly women and children, effectively ending the rebellion.

95.   One of the "friendly heroic Sioux," Mdewakanton Thomas A. Robertson, selected by Mdewakanton Chief Little Crow to be a messenger between the Chief and General Sibley. Thomas also secretly carried a letter from Mdewakanton Chief Taopi of the "friendly Sioux" risking imminent death to save countless innocent lives.

96.   By November 5, 1862, nearly 400 Sioux were tried, 303 of which were convicted and initially sentenced to death.  Those Sioux who were not of the nearly 400 tried fled Minnesota to northwest into Dakota Territories and

into Canada.  The "friendly heroic Sioux," including Thomas A. Robertson, were not criminals.  They were heroes who saved lives.

## H.   1863 Acts of Congress did not abrogate entire treaties nor repeal the 1854 Act of Congress.

97.    Lawful treaties made and ratified with any Indian nation or tribe prior to March 3, 1871 cannot be invalidated or impaired.

98.    Under 25 U.S. Code § 71 governing future treaties with Indian Tribes states that "[n]o Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired…."

99.    Six months after the 1862 uprising, through the Act of February 16, 1863, Congress annulled only part of the United States treaties with the Sioux tribes (as the marginal notes also indicate). Congress provided that, with the exception of "each individual of the before mentioned bands who exerted himself in rescuing the whites from the late massacre…," for whom the Secretary of the Interior was authorized to "set apart of the public lands…eighty acres in severalty," "all treaties heretofore made…by the Sisseton, Wahpeton, Mdewakanton, and Wahpokoota bands…with the United

States, are hereby declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States, and all lands and rights of occupancy...and all annuities...forfeited to the United States."

100.   The February 1863 Act, for the individuals who rescued whites from the massacre, reflected the same provisions as the Treaty of June 1858, that "eighty acres thereof, as near as may be in conformity with the public surveys, be allotted in severalty to each head of a family, or single person over the age of twenty-one years, in said band of Indians…said tracts to be exempt from levy, taxation, sale or forfeiture, until otherwise provided for by the legislature of the State in which they are situated with the assent of Congress; nor shall they be sold or alienated in fee, or be in any other manner disposed of except to the United States or to members of said bands." Act of June 1858.

101.   Thus, Section 9 of the February 1863 Act was an exception to Section 1 of the same Act regarding the abrogation of lands and rights of occupancy within Minnesota.  The Mdewakanton Band, now consisting of the individuals who rescued whites during the 1862 uprising, continued to be federally recognized.  In turn, Congress granted lands to the Mdewakanton Band.  Mdewakanton Band members were not required to sever tribal relations under the Act.  Section 9 is contrary to later Congressional

Appropriation Acts of 1888, 1889, and 1890 that ultimately created certain Minnesota Communities *because* members *severed* tribal relations as demanded by the Acts.

102.   Like the Act of July 17, 1854, in which Congress recognized the Mdewakanton Band and its mixed-blood members through the specific reference and reliance of the Prairie du Chien Treaty of 1830, by the Act of February 16, 1863, Congress codified the Treaty of 1858 to continue to provide Mdewakanton lands within the state of Minnesota.

103.   In so doing, Congress recognized and acknowledged the existence of the Mdewakanton Band as the July 17, 1854 Act was in direct correlation with the 1830 Treaty between the United States and the Mdewakanton Band.  The Act of July 17, 1854 recognized and acknowledged the existence of the Mdewakanton Band.

104.   Moreover, because the Act of July 17, 1854 was a Congressional statute, that protected the interests of both the Mdewakanton Band regarding the lands within the Lake Pepin Reservation and that of the United States.

105.   The February Act of 1863 did not affect the Mdewakanton Band interests in the Lake Pepin Reservation lands.

106.   The February Act of 1863 *did not* terminate the Mdewakanton Band.

107.   The February Act of 1863 did not repeal the Act of July 17, 1854 which codified the recognition and acknowledgement of the Mdewakanton Band and the mixed-blood members of the Band, nor did it affect the existence of the Lake Pepin Reservation.

108.   The February Act of 1863 further affirmed the existence of the Mdewakanton Band, to be sure, limited in this instance by Congressional statutory recognition and acknowledgment to the "friendly heroic Sioux," which consisted of any individual "who exerted himself in rescuing the whites from the late massacre of said Indians."

109.   The "friendly heroic Sioux," which included Thomas A. Robertson, did not violate Article 1 of the 1858 Treaty regarding the agreement to maintain peaceful relations with the United States.  He supported the United States during the uprising.  Through his actions he remained peaceful toward the United States.  He did not participate in the August 1862 uprising.  He did participate as a messenger to quell the uprising.   He did participate in the rescue of white settlers from the offending Sioux.

110.   Additionally, the February Act of 1863 did not diminish, repeal, or amend, the statutory effect of the Act of July 1854 to the Mdewakanton Band and its mixed-blood members because the February Act of 1863 only abrogated "treaties," and only in part, while leaving statutes, such as the Act of July 1854, unrepealed.

111.   Further, an additional reservation of 12 square miles was set aside for the Mdewakanton Band in 1865. The Band at that time was unambiguously "under Federal jurisdiction"—even though the lands were later taken back.  Specifically, on March 17, 1865, the Secretary used his authority under Section 9 to set apart a 12 square mile reservation (i.e., 12 sections or 7,680 acres) for the Mdewakanton Band.

112.   The Secretary authorized "Revd. S.D. Hinman, Missionary … to designate twelve sections in a reasonably compact body and I will direct the local land offices to reserve the same from settlement or sale as soon as they are notified of Mr. Hinman's selection."

113.   Reverend Hinman, under the authority of the Secretary, identified 12 sections of land in Minnesota, and wrote each of the 12 specific sections down on the same Secretary letter of March 17, 1865.

114.   The 12 sections Reverend Hinman were identified as being within Redwood, Renville, and Sibley Counties (Minnesota):  Sections 1, 2, 3, 11 and 12, T. 112 N., R. 35; Section 35, T. 113 N., R. 35; Section 5, 6, 7, 8 and 9, T. 112 N., R. 34; Section 31, T. 113 N., R. 31.

115.   The Secretary of Interior *initialed* Reverend Hinman's selection–, and hence, exercised his authority affirming and confirming the identified lands as those set aside for Mdewakanton Band.

116.   Six days later, on March 23, 1865, the Commissioner of Indian Affairs wrote to Rev. Hinman confirming the "decision of the Secy of the Interior already in your hands will be sufficient to authorize you to proceed to collect and establish the friendly Sioux upon the lands designated by you in your letter of the 17th instant."

117.   The Commissioner, as was within his authority also noted that "Supt. Thompson has been authorized to expend a sum not exceeding eight hundred dollars for plowing land and for the purchase of farming tools and seeds for the Indians in question."

118.   By letter dated May 18, 1869, the Commissioner acknowledged and reaffirmed that the lands for the Mdewakanton Band had been set aside in Minnesota as authorized by the Secretary in 1865.

119.   However, due to other issues beyond Interior's control, the Commissioner later recommended selling the land to the public.  Those lands, previously acknowledged and reaffirmed as having been set aside were then sold to the public.

120.   Yet, Section 9 of the Act of February 1863, stated that such "land so set apart… shall be an inheritance to said Indians and their heirs forever." Act of Feb. 16, 1863, 12 Stat. 652 App. 128.  Inconsistently, those lands which were set-aside forever were not set aside for those friendly heroic Sioux as Congress had directed.

121.   As a result of Congressional Acts passed in February of 1863 and another act identified as the March 3, 1863 Act, which also included provisions to provide 80 acres of land in Minnesota to the "friendly heroic Sioux," all Mdewakanton Sioux Indians were to be removed from Minnesota, but for the "friendly heroic Sioux" who remained intact as the Mdewakanton Band.

122.   Specifically, the Act of March 3, 1863, ordered the removal of all Sioux Indians—with the exception of the friendly heroic Mdewakanton Sioux—from the state of Minnesota (ultimately to new Indian reservations in Dakota and Nebraska Territories outside the boundaries of any state).

123.   The March 3, 1863 Act did not *did not* terminate the Mdewakanton Band.

124.   The March Act of 1863 did not repeal the Act of July 17, 1854 which codified the recognition and acknowledgement of the Mdewakanton Band and the mixed-blood members of the Band, nor did it affect the existence of the Lake Pepin Reservation.

125.   The March Act of 1863 affirmed the existence of the Mdewakanton Band, to be sure limited by a Congressional act to the "friendly heroic Sioux" which consisted of any individual "who exerted himself in rescuing the whites from the late massacre of said Indians."

126.   Congress, again, on February 9, 1865, enacted an act for the "friendly heroic Sioux" as an attempt to correct the deplorable conditions they were subjected to despite their allegiance to past treaty provisions to maintain peace with the United States and rescue white settlers during the 1862 uprising.

127.   The purpose of the February 9, 1865 Act—An Act for Relief of Certain Friendly Indians of the Sioux Nation in Minnesota, was to provide the "friendly heroic Sioux" with moneys to purchase the seed and implements needed once they received the grant of eighty acres as identified in the February 16, 1863 Act.

> Whereas certain Indians of the Sioux nation did, during the outbreak in Minnesota in [1862], at the risk of their lives, aid in saving many white men, women, and children from being massacred, and, in consequence of such action, were compelled to abandon their homes and property, and are now entirely destitute of the means of support: Therefore, Be it enacted by Senate and the House of Representatives of the United States of America in Congress assembled, That the *President of the United States be, and he hereby is, authorized and requested to cause an examination to be made in relation to all of the facts pertaining to the action of the said Indians, and to make such provision for their welfare as their necessities and future protection may require.*

> Sec. 2. And be it further enacted, That, for the purpose of carrying out the provisions of this act, the sum of [$7500] be, and the same is hereby, appropriated, out of any money in the treasury not otherwise appropriated; one third of said sum to be paid and expended for the benefit of Am-pe-tu-to-ke-cha, or John Other-day, and the remainder for the

benefit of such other Indians *as shall appear specially entitled thereto, for their friendly, extraordinary, and gallant services in rescuing white settlers from massacre in Minnesota....the Secretary of the Interior shall report to the next congress the names of the Indians for whose benefit the same shall be expended*, and the amount expended for each."

(Emphasis added).

128.   In compliance with the Congressional mandate, the Department of the Interior assigned Special Commissioner Shubael P. Adams to undertake an investigation and to prepare a list of the "friendly heroic Sioux" who were entitled to a grant of eighty acres under the February Act of 1863 and an allotment of cash under the Act of February 9, 1865.

129.   The Fort Snelling Minnesota's governing military officer during the 1862 uprising, General Sibley, stated that, "[t]hey are comparatively few in number and their names can be readily ascertained."

130.   A list containing 36 Dakota Sioux Indian names was submitted to Interior Commissioner H.D. Cooley in June 1866, and approved by him soon thereafter.  The list included the name of Thomas A. Robertson.

131.   The list does not state that any Indian on that list severed their tribal relations with the Mdewakanton Band.

132.   Thomas A. Robertson did not sever his tribal relations with the Mdewakanton Band.  Mdewakanton Band member Thomas A. Robertson did not sever his tribal relations at any time.

35

133.   Meanwhile, in March 1865, Secretary of Interior, John P. Usher, citing his own authority in a letter to Reverend Samuel Hinman, dated March 17, 1865, directed Hinman to select lands to be reserved for that purpose:

> Under provisions of Section 9 of the Act of Congress approved February 16 and Section 4, of the Act approved March 3, 1863 this Department has authority to locate individual Sioux Indians of the Sioux tribe who exerted themselves to save the lives of the Whites during the massacre of 1862 upon lands within the late Sioux reservation assigning 80 acres to each.  In order to do this hereafter, it is necessary immediately to withdraw from sale a portion of the Reservation, and I do not deem twelve sections (7,680 acres) of land too great a quantity.

Letter, Secretary of Interior, John P. Usher, dated March 17, 1864.

134.   The letter specifically lists the description of each of the twelve sections of land available for the set aside.

135.   A letter from Mr. M.P. Dole of the Office of Indian Affairs, to Reverend Hinman directed him to "collect and establish the friendly Sioux upon the lands designated by your letter of the 17th of March." Letter of M.P. Dole to Rev. S.D. Hinman, dated March 23, 1865.

136.   Report No.102 of the 1866 Report of the Commissioner of Indian Affairs, dated April 20, 1866, also documents the setting aside of lands:

> Action was taken by the department, about one year ago (in 1865, the same year of the Act), to select for them (the Sioux who acted to rescue whites) eighty acres of land each upon the old reservation, but the feeling among the whites

> is such as to make it impossible for them to live there in
> safety.

Letter, Secretary of Interior, John P. Usher, dated March 17, 1864.

137.   The 1866 report reflects the continuing hostility of whites toward

Indians in Minnesota despite Congressional attempts to protect the friendly

heroic Sioux:

> In regard to those Indians it is noticeable that Congress
> has, by several enactments, made attempts to provide for
> them by donations of lands and money; but it has been
> found impracticable to accomplish anything under those
> acts, on account of the hostility manifested by the white
> people of the region towards everything in the form of an
> Indian. Many of these men have, for the past three years,
> been homeless wanderers, and actually suffering from
> want; a very poor return for services rendered to the
> whites at the risk of their lives.

Letter, Secretary of Interior, John P. Usher, dated March 17, 1864.

I.   **The Appropriation Acts of 1888, 1889, and 1890 required severance of
     tribal relations which Petitioners Terri Robertson-Torgerson and Ross
     Torgerson and their ancestors never did.**

138.   Congress, in 1888, 1889, and 1890 would enact laws to

appropriate moneys that would eventually lead to purchases of lands for a

specific group of Mdewakanton Sioux *distinct from* the identified "friendly

heroic Sioux."

139.   The Act of 1888 provides:

> "For the support of the full-blood Indians in
> Minnesota, belonging to the Mdewakanton Band of
> Sioux Indians, *who have resided in said State since*

> *the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations*, twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses, and lands ...."

Act of June 29, 1888, 25 Stat. at 228-29 (emphasis added).

140.   The Act of 1889 provides:

> "For the support of the full-blood Indians in Minnesota heretofore belonging to the Mdewakanton Band of Sioux Indians, *who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations*, twelve thousand dollars, to be expended... in the purchase ... of such lands...."

Act of Mar. 2, 1889), 25 Stat. at 992-93 (emphasis added).

141.   The Act of 1890 provides:

> "For the support of the full and mixed blood Indians in Minnesota heretofore belonging to the Mdewakanton Band of Sioux Indians, *who have resided in said State since the twentieth day of May, eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations*, eight thousand dollars, to be expended by the Secretary of the Interior, as in his judgment he may think best, for such lands...."

Act of Aug. 19, 1890, 26 Stat. at 349 (emphasis added).

142.   Each Appropriation Act of 1888, 1889, and 1890 is directed to the Mdewakanton Sioux who had resided in Minnesota since May 20, 1886, and who had *severed their relations* with their tribe.

143.   The Appropriation Acts of 1888, 1889, and 1890 Acts were not directed toward the Mdewakanton Sioux who rescued white settlers during the Minnesota 1862 Indian uprising who did not sever their tribal relations and the same group whose tribal status and treaty rights had been confirmed and codified in the Acts of 1854, 1863, and 1865.

144.   Lawful treaties made and ratified with any Indian nation or tribe prior to March 3, 1871 cannot be invalidated or impaired. Thus, treaties entered into prior to 1871 are still recognized.

145.   Congress, by its Acts of 1854, 1863, and 1865 codified the recognition and acknowledgement of the Mdewakanton Band.

146.   With the passage of the IRA in 1934, Congress recognized and acknowledged the Mdewakanton Band of Sioux in Minnesota, wherein the non-tribal terminated members, residing on lands acquired under the 1888, 1889, and 1890 Appropriation Acts, which required severance of tribal relations, were later allowed to organize as communities.   The lineal descendants of the Tribe, such as Petitioners Terri Roberson-Torgerson and Ross Torgerson, remain members of the tribal entity, the Mdewakanton Band.

147.   Melvin Robertson, Sr., for instance, father of Terri Robertson-Torgerson, did not sever his tribal relations with the Mdewakanton Band, and lived on a reservation before and on June 1, 1934. He lived on the Lake Traverse Indian Reservation.

148.   The IRA did not terminate the Mdewakanton Band whose members did not sever tribal relations.

149.   In 1978, Interior promulgated Part 83 of its regulations under the Indian Reorganization Act (also known as the Federal Acknowledgement Process), which set out procedures for Indian groups to seek formal recognition.

150.   However, Part 83, specifically § 83.3 "applies only to indigenous entities that are *not federally recognized* Indian tribes." Emphasis added.

151.   So, Part 83 and its requirements do not apply to the Mdewakanton Band because they are already federally recognized as evidenced by the treaties and statutes referenced in this petition.

152.   By these acts of Congress, the Mdewakanton Band is a federally recognized and acknowledged Indian tribe.

153.   No act of Congress has terminated the Mdewakanton Band as a tribe.

154.   Acts of Congress allow or require Interior to provide land to the Mdewakanton Band as a federally recognized and acknowledged Indian tribe.

## COUNT I

### Violation of the Federally Recognized Indian Tribe List Act of 1994 with the omission of the Mdewakanton Band of Sioux in Minnesota.

155.   Petitioners re-allege all paragraphs above as is fully set forth herein as they relate to the claim asserted.

156.   Under the Federally Recognized Indian Tribe List Act of 1994, Public Law 103–454, 103d Congress, 108 Stat. 4791 (Nov. 2, 1994), the term "'Indian tribe' means any Indian…tribe, band…that the Secretary of the Interior acknowledges to exist as an Indian tribe." Sec. 101.

157.   The List Act, under Section 103, also states that "[t]he Congress finds that—… (3)Indian tribes presently may be recognized by Act of Congress.…"

158.   The List Act, under Section 103 (4) states that "a tribe which has been recognized in one of these manners may not be terminated except by an Act of Congress.…"

159.   The List Act, under Section 103(6) states that "the Secretary of the Interior is charged with the responsibility of keeping a list of all federally recognized tribes..." and the under 103(7) that the "list published by the Secretary should be accurate, regularly updated, and regularly published."

160.   The tribal list of the Secretary of the Interior is published annually on or before January 30 of every calendar year.

161.   The Secretary's tribal list does not include the Mdewakanton Band of Sioux in Minnesota.

162.   The Secretary's tribal list does not include the Mdewakanton Band of Sioux in Minnesota as a federally recognized tribe or band of Indians.

163.   The Secretary's exclusion or omission of the Mdewakanton Band of Sioux in Minnesota means that the list is not complete as required by law to be complete.

164.   Under 25 U.S.C. § 5121, "nothing in this [Indian Reorganization] Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States."

165.   Under the Indian Reorganization Act, 25 U.S.C. § 5130 (2), "the term 'list' means the list of recognized tribes published by the Secretary pursuant to section 5131 of this title."

166.   Under 25 U.S.C. § 5131(a), the Secretary of the Department of the Interior is to publish "a list of all Indian tribes which the Secretary *recognizes* to be eligible for special programs and services provided by the United States to Indians because of their status as Indians." (Emphasis added).

167.   The Mdewakanton Band has a clear and indisputably right to be listed as a federally recognized and acknowledged tribe.

168.   Because Part 83 (§ 83.3) of the Interior regulations "applies only to indigenous entities that are not federally recognized Indian tribes" review by Interior is not possible.

169.   Congressional statutes lack a statutory procedure to list federally recognized tribes omitted from Interior's annual list of recognized Indian tribes.

170.   Interior rules lack an administrative procedure to list federally recognized tribes omitted from the list.

171.   Any Interior administrative process is inapplicable under 25 C.F.R. Part 83, because 25 C.F.R. § 83.3 applies "only to indigenous entities that are not federally recognized Indian tribes."

172.   Interior's annual error of omitting the Mdewakanton Band of Sioux in Minnesota is ministerial.

173.   By the acts of Congress in 1854, 1863, and 1865, Congress codified its recognition of the Mdewakanton Band as a federally recognized and acknowledged tribe.

174.   Under the Federally Recognized Indian Tribe List Act of 1994, the Secretary has no discretion regarding the listing of the Mdewakanton Band as a federally recognized tribe because the Band is "presently recognized by an Act of Congress"—actually multiple Acts of Congress.

175.   Without the listing of the Mdewakanton Band, the published list is not complete as required under the Federally Recognized Indian Tribe List Act of 1994, Section 103(6).

176.   Without the listing of the Mdewakanton Band, the published list does not include all recognized Indian tribes eligible for "special programs and services provided by the United States to Indians because of their status as Indians" as required under the Federally Recognized Indian Tribe List Act of 1994, Section 104(a).

177.   The Appropriation Acts of 1888, 1889, and 1890 were directed to the Mdewakanton Sioux who had resided in Minnesota since May 20, 1886, and who had *severed their relations* with their tribe.

178.   The Appropriation Acts of 1888, 1889, 1890, that required Indians the severance of tribal relations is a termination act of those Indians who had done so to acquire the benefits bestowed upon them by the terms of the Acts.

179.   The Appropriation Acts of 1888, 1889, and 1890 were not directed toward the Mdewakanton Sioux who rescued white settlers during the Minnesota 1862 Indian uprising who did not sever their tribal relations and the same group whose tribal status and treaty rights had been confirmed and codified in the Acts of 1854, 1863, and 1865.

180. The Petitioners Terri Robertson-Torgerson and Ross Torgerson and their ancestors who were members of the Mdewakanton Band did not sever their tribal relations and were never terminated by an act of Congress.

181. Because members of the Mdewakanton Band did not sever their tribal relations, the Band is not a splinter group of any other Indian group or community of Indians that derived their existence from the Appropriation Acts of 1888, 1889, and 1890.

182. The Act of 1854 further established the Lake Pepin Reservation for members of the Mdewakanton Band.

183. The Act of 1854 further established the Lake Pepin Reservation for members of the Mdewakanton Band who were also of mixed-blood.

184. The Act of 1854 confirmed that the Mdewakanton Band were under the federal jurisdiction of the United States.

185. The February Act of 1863 did recognize a specific group of "friendly heroic Sioux" within the Mdewakanton Band resulting in the setting aside of 12 sections of Minnesota lands for them.

186. The United States did set aside 12 sections of Minnesota lands for the friendly heroic Sioux in 1865 as congressionally authorized under the February Act of 1863 for the friendly heroic Sioux.

187. The February Act of 1863 confirmed that the Mdewakanton Band continued to be under the federal jurisdiction of the United States.

188.   The March Act of 1863 confirmed that the Mdewakanton Band continued to be under the federal jurisdiction of the United States.

189.   The Act of 1865 confirmed that the Mdewakanton Band continued to be under the federal jurisdiction of the United States.

190.   The Acts of February 1863 and March 1863 did not terminate the Mdewakanton Band.

191.   The Acts of February 1863 and March 1863 did not repeal the recognition of the Mdewakanton Band as a federally-recognized and federally-acknowledged Indian tribe.

192.   The February Act of 1863 did not repeal the 1854 Act of Congress.

193.   The March Act of 1863 did not repeal the 1854 Act of Congress.

194.   The Secretary of the Interior or the Assistant Secretary for Indian Affairs or both his agents, representatives, or both, has admitted that the Mdewakanton Band is a federally recognized Indian tribe.

195.   No intervening act of Congress terminated or repealed the Mdewakanton Band to revoke its recognition as a tribe.

196.   No act of Congress has repealed the recognition and acknowledgement of the Mdewakanton Band as a federally recognized Indian tribe.

197.   No act of Congress has terminated the Mdewakanton Band as an Indian tribe.

198.   The previous Congressionally codified recognition of the Mdewakanton Band, such as the Act of 1854 and no subsequent intervening act terminating the tribe, the Mdewakanton Band was an Indian tribe under federal jurisdiction in 1934.

199.   The Mdewakanton Band, as a federally recognized tribe by Acts of Congress, means it has a clear and indisputable right to be listed as a federally recognized tribe under the List Act.

200.   In 2014, the Mdewakanton Band and Terri Robertson-Torgerson and Ross Torgerson filed a petition for reaffirmation with the Department of the Interior under the then existing administrative rules.  Although not a necessary action, the Petitioners took the step demonstrating an abundance of caution. Nevertheless, after four and one-half years of the administrative process, Interior failed to render a decision, although it planned to do so.

201.   Interior also revised rules governing the administrative process under Part 83 of the Code of Federal Regulations.  Under the revised Rules, the Mdewakanton Band, and its members, Terri Robertson-Torgerson, Ross Torgerson, and his child, are expressly precluded from any administrative process, because the Mdewakanton Band *is a federally recognized Indian tribe* as described throughout the instant petition.

202.   Interior failed to list the Mdewakanton Band under 25 U.S.C. § 5131(a) even though it was legally required to do so.

203.   Interior failed to list the Mdewakanton Band under 25 U.S.C. § 5131(a) since the inception of this provision and has failed continuously to list the Petitioner as a federally recognized tribe each year of the lists' publication, including but not limited to 2014, 2015, 2016, 2017, and 2018.

204.   The failure to place the Mdewakanton Band on the list of federally-recognized tribes under 25 U.S.C. § 5131(a) has caused harm.

205.   The failure to place the Mdewakanton Band on the list of federally recognized tribes under 25 U.S.C. § 5131(a) is a violation of the law, specifically Interior's legal duty to recognize the Mdewakanton Band by placing it on the list of federally-recognized tribes and treat it, accordingly, as a federally-recognized Indian tribe.

206.   Interior's failure to list the Mdewakanton Band under 25 U.S.C. § 5131(a) is a violation of Interior's legal duty to the Mdewakanton Band; thus, its decision not to do so is arbitrary, capricious, abuse of discretion, and not in accordance with the law, under 5 U.S.C. § 706(2)(A) and in excess of Interior's statutory jurisdiction under 5 U.S.C. § 706(2)(C).

207.   Because Part 83 (§ 83.3) of the Interior regulations "applies only to indigenous entities that are *not* federally recognized Indian tribes," administrative review by Interior is not possible. (Emphasis added.)

208. The Mdewakanton Band is entitled to a writ of mandamus to direct Interior through the Secretary and the Assistant Secretary of Indian Affairs, the named Respondents, or their respective successors, to list the Mdewakanton Band of Sioux in Minnesota as a federally recognized Indian tribe under 25 U.S.C. § 5131(a).

209. The Mdewakanton Band should be entitled to all other relief this Court would deem justified under the facts, circumstances, and the law in this case.

## COUNT II
### Declaratory Judgment and Injunctive Relief
### Pertaining to the Petition

210. In addition to the petition for writ of mandamus, the Petitioner brings in the alternative this Count II which includes claims for declaratory relief and injunctive relief.

211. Petitioners re-allege all paragraphs above as is fully set forth herein as they relate to the claim asserted.

212. Under 25 U.S.C. § 5121, "nothing in this [Indian Reorganization] Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States."

213.   Under the Indian Reorganization Act, 25 U.S.C. § 5130 (2), "the term 'list' means the list of recognized tribes published by the Secretary pursuant to section 5131 of this title."

214.   Under 25 U.S.C. § 5131(a), the Secretary of the Department of the Interior is to publish "a list of all Indian tribes which the Secretary recognizes to be eligible for special programs and services provided by the United States to Indians because of their status as Indians."

215.   The fact that the Mdewakanton Band has not been recognized by the Secretary of the Interior on the list of recognized tribes under 25 U.S.C. § 5131(a) does not preclude it from making the instant claim.

216.   Under the Indian Reorganization Act, 25 U.S.C. § 5129, "[t]he term 'Indian'…shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction…."

217.   Under the Indian Reorganization Act, 25 U.S.C. § 5129, "[t]he term 'Indian'…shall include…all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation…."

218.   For instance, Melvin Robertson, Sr., Petitioner Terri Robertson-Torgerson's father, was a Mdewakanton Band member, having 25/32 or 78% Indian blood, and resided on an Indian reservation before and on June 1,

1934. He never severed his tribal relations. Before and on June 1, 1934, Melvin Robertson, Sr., resided on the Lake Traverse Indian Reservation.

219.   Doris King LaFontaine, Petitioner Terri Robertson-Torgerson's mother, having ¾ or 75% Indian blood and resided on an Indian reservation before and on June 1, 1934. She resided on the Lake Traverse Indian Reservation. She never severed her tribal relations,

220.   Petitioner Terri Robertson-Torgerson is a lineal descendent of her parents Melvin Robertson, Sr., and Doris King LaFontaine.  She has lived on an Indian reservation her entire life and has 49/64 or 77% Indian blood.  She has never severed her Mdewakanton tribal relations.

221.   Ross Torgerson, son of Terri Robertson-Torgerson, has lived on an Indian reservation all of his life.  He is a mixed blood Indian of the Mdewakanton Band and has 135/256 or 53% Indian blood.  He has never severed his tribal relations.  He has a child recently born in 2017.

222.   Under the Indian Reorganization Act, 25 U.S.C. § 5129, "[t]he term 'Indian'…shall further include all other persons of one-half or more Indian blood…."

223.   Under the Indian Reorganization Act, 25 U.S.C. § 5130(1), the term "Indian tribe" means "any Indian… tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe."

224.   Through previous acts of Congress, the Secretary of the Interior has historically recognized the Mdewakanton Band as a tribe under federal jurisdiction.

225.   By the acts of Congress in 1854, 1863, and 1865, Congress codified its recognition and acknowledgement of the Mdewakanton Band as a federally recognized and acknowledged Indian tribe.

226.   The Appropriation Act of 1888, 1889, and 1890 were directed to the Mdewakanton Sioux who had resided in Minnesota since May 20, 1886, and who had *severed their relations* with their tribe.

227.   The Appropriation Acts of 1888, 1889, and 1890 were not directed toward the Mdewakanton Sioux who rescued white settlers during the Minnesota 1862 Indian uprising who did not sever their tribal relations and the same group whose tribal status and treaty rights had been confirmed and codified in the Acts of 1854, 1863, and 1865.

228.   Members of the Mdewakanton Band did not sever their tribal relations.

229.   Because members of the Mdewakanton Band did not sever their tribal relations, the Band is not a splinter group of any other Indian group or communities of Indians that derived their existence from the Appropriation Acts of 1888, 1889, and 1890.

230.   The Act of 1854 further established the Lake Pepin Reservation for members of the Mdewakanton Band.

231.   The Act of 1854 confirmed that the Mdewakanton Band was under the federal jurisdiction of the United States.

232.   The February Act of 1863 did recognize a specific group of "friendly heroic Sioux" within the Mdewakanton Band resulting in the setting aside of 12 sections of Minnesota lands for them.

233.   The United States did set aside 12 sections of Minnesota lands for the friendly heroic Sioux in 1865 as congressionally authorized under the February Act of 1863.

234.   The February Act of 1863 confirmed that the Mdewakanton Band continued to be under the federal jurisdiction of the United States.

235.   The March Act of 1863 confirmed that the Mdewakanton Band continued to be under the federal jurisdiction of the United States.

236.   The Act of 1865 confirmed that the Mdewakanton Band continued to be under the federal jurisdiction of the United States.

237.   The Acts of February 1863 and March 1863 did not terminate the Mdewakanton Band.

238.   The Acts of February 1863 and March 1863 did not repeal the recognition of the Mdewakanton Band as a federally recognized and acknowledged tribe.

239.   The Acts of February 1863 and March 1863 did not repeal any act of Congress related to the Mdewakanton Band, such as the Act of 1854 regarding the Lake Pepin Reservation for mixed-blood Indians. The Act of 1854 is unrepealed.

240.   The Acts of February 1863 and March 1863 did not abrogate in their entirety all previous treaties with the Mdewakanton Band.

241.   No intervening Act of Congress terminated or repealed the Mdewakanton Band to revoke its recognition as a tribe.

242.   No act of Congress has repealed the recognition of the Mdewakanton Band as a federally recognized and acknowledged Indian tribe.

243.   No act of Congress has terminated the Mdewakanton Band as a federally recognized and acknowledged Indian tribe.

244.   The previous Congressional acts codified the recognition and acknowledgement of the Mdewakanton Band and means that it was a "recognized Indian tribe now under federal jurisdiction" in 1934.

245.   Under the Federally Recognized Indian Tribe List Act of 1994, the Secretary has no discretion regarding the listing of the Mdewakanton Band as a federally recognized tribe because the Band is "presently recognized by an Act of Congress."

246.  Without the listing of the Mdewakanton Band, the published list is not complete as required under the Federally Recognized Indian Tribe List Act of 1994, Section 103(6).

247.  Without the listing of the Mdewakanton Band, the published list does not include all recognized Indian tribes eligible for "special programs and services provided by the United States to Indians because of their status as Indians" as required under the Federally Recognized Indian Tribe List Act of 1994, Section 104(a).

248.  As a tribe, the Mdewakanton Band is entitled by law to be on the list of federally-recognized tribes and to be treated accordingly.

249.  Interior has violated its legal duty to recognize the Mdewakanton Band and to place them on the list of federally-recognized tribes and treat them accordingly.

250.  The Mdewakanton Band is not on the list of Indian tribes which is published under 25 U.S.C. § 5131, and the lack of the Interior Secretary's recognition of the Tribe does not preclude a determination of this Court that the Mdewakanton Band was recognized  as an Indian tribe and existed on June 18, 1934, the date of the Indian Reorganization Act, as being under federal jurisdiction, and that the Mdewakanton Band continues  in existence because Congress has not passed an act to terminate the Tribe.

251.   The Mdewakanton Band has a clear and indisputably right to be listed as a federally recognized tribe.

252.   Because Part 83 (§ 83.3) of the Interior regulations "applies only to indigenous entities that are not federally recognized Indian tribes," review by Interior is not possible.

253.   This Court has the authority and should adjudicate and declare under 28 U.S.C. § 2201, that the Mdewakanton Band is an Indian Tribe recognized and acknowledged by the United States and was under federal jurisdiction on June 18, 1934.

254.   Petitioners pray that this Court issue a declaratory judgment against the Department of the Interior stating that the Department is legally required to recognize the Mdewakanton Band and required to place the Mdewakanton Band on the list of federally-recognized tribes, and treat the Mdewakanton Band accordingly as required under federal law.

255.   Moreover, Petitioners pray that this Court issue an injunction against the Department of the Interior: requiring the Respondents to recognize the Mdewakanton Band place the Mdewakanton Band on the list of federally-recognized tribes, and treat the Mdewakanton Band accordingly as required under federal law.

256.   The Mdewakanton Band should be entitled to all other relief this Court would deem justified under the facts, circumstances, and the law in this case.

## JURY TRIAL DEMANDED

257.   If necessary, a jury trial is demanded.

## PRAYER FOR RELIEF

WHEREFORE, the Petitioners, Mdewakanton Band of Sioux in Minnesota, Terri Robertson-Torgerson and Ross Torgerson, request that this Court:

1. Enter judgment in favor of the Petitioners Mdewakanton Band of Sioux in Minnesota, Terri Robertson-Torgerson and Ross Torgerson on Counts I and II;

2. Issue a writ of mandamus under this Court's authority directing the Respondents Secretary of the Interior or Assistant Secretary for Indian Affairs or both to add the Mdewakanton Band of Sioux in Minnesota to the list of federally-recognized tribes and to act accordingly under federal law;

3. Declare that the Respondents Secretary of the Interior or Assistant Secretary for Indian Affairs or both have violated the statutory rights of the Petitioners to federal recognition;

4. Issue a declaratory judgment against the Respondents Secretary of the Interior or Assistant Secretary for Indian Affairs or both directing them to add the Mdewakanton Band of Sioux in Minnesota to the list of federally-recognized tribes and treat the Mdewakanton Band accordingly under federal law;

5. Issue an injunction against the Respondents Secretary of the Interior or Assistant Secretary for Indian Affairs or both, directing them to add the Mdewakanton Band to the list of federally-recognized tribes and treat the Mdewakanton Band of Sioux in Minnesota accordingly under federal law;

6. Award attorney fees, expenses, costs and disbursements under the federal Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) to the Petitioners Mdewakanton Band of Sioux in Minnesota, Terri Robertson-Torgerson and Ross Torgerson;

7. Award costs and disbursements to the Petitioners Mdewakanton Band of Sioux in Minnesota, Terri Robertson-Torgerson and Ross Torgerson; and

8. Grant to the Petitioners Mdewakanton Band of Sioux in Minnesota, Terri Robertson-Torgerson and Ross Torgerson all other relief the Court finds just and equitable under any law.

DATED: February 15, 2019        /s/Erick G. Kaardal

Erick G. Kaardal (WI0031)
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota  55402
Telephone: (612) 341-1074
Facsimile:  (612) 341-1076
Email: kaardal@mklaw.com

*Attorneys for Petitioners*